## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BRIAN J. MAGRAS, | ) | Chapter 7 |
| | ) | Case No. 17-11833 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| BRIAN J. MAGRAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 20-01054 |
| | ) | |
| BANGOR SAVINGS BANK, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## BANGOR SAVINGS BANK'S MOTION TO DISMISS

NOW COMES Bangor Savings Bank ("BSB"), by and through its undersigned counsel, and, pursuant to Federal Rule of Civil Procedure 12(b)(6), made applicable to this proceeding pursuant to Bankruptcy Rule 7012, moves to dismiss the Verified Complaint, filed by Brian J. Magras ("Debtor") on April 21, 2020 (the "Complaint") for failure to state a claim upon which relief can be granted.  In support of this motion to dismiss (the "Motion"), BSB says as follows.

## INTRODUCTION

The Complaint seeks: 1) a judgement against BSB for an alleged violation of the Discharge Order, 2) a judgment against BSB for an alleged violation of the automatic stay, and 3) resulting actual, consequential, and punitive damages along with Debtor's attorney's fees. There is no basis in law or fact for Debtor's claims or the requested relief and the Complaint should be dismissed.

## FACTUAL AND PROCEDURAL BACKGROUND

Debtor's Loan with BSB

Prepetition, on July 28, 2010, Debtor executed and delivered to BSB a certain Adjustable Rate Note in the original principal amount of $130,000 (the "Note").  To secure the Note, Debtor executed and delivered to BSB a certain Mortgage, dated July 28, 2010 (the "Mortgage"), which Mortgage is recorded in the Kennebec County Registry of Deeds in Book 10485, Page 311.  A true copy of the Mortgage is attached hereto as Exhibit A.  Pursuant to the terms of the Mortgage, Debtor granted BSB a first priority security interest in certain real property located at 16 Blue Road, Monmouth, Maine (the "Property").  *See* the Mortgage.

Chapter 7 Case

Debtor filed for Chapter 7 bankruptcy on May 17, 2017 (the "Filing Date").  *See* Compl. ¶ 4.  On Debtor's Schedule A/B, he valued the Property at $120,000.  *See* id. ¶ 5.  Debtor listed BSB's secured debt on the Property in the amount of $115,946.44, indicating that, as of the Filing Date, he had equity in the Property and BSB was an oversecured creditor.  *See* id. ¶ 8.  On Debtor's Statement of Intentions, he indicated that he would "retain collateral [i.e. the Property] and keep making payments."  *See* id. ¶ 9.  Upon information and belief, sometime between June and September 2017 (and possibly before that), while Debtor's Chapter 7 case was pending, Debtor got a new job, moved into the Property, and has resided there since.

In June 2017, Debtor went into a local BSB branch and made inquiries that indicated he may want to reaffirm his debt with BSB.  Accordingly, on June 30, 2017, counsel for BSB reached out to then-counsel for Debtor ("Bankruptcy Counsel") to determine what Debtor's intentions were regarding the Property.  *See* Letter from Bruce Hochman to Carl D'Angio Jr. (June 30, 2017) (the "6/30/17 Letter"), attached hereto as Exhibit B; *see also* Compl. ¶ 10.  In

2

response to the 6/30/17 Letter, Debtor's Bankruptcy Counsel indicated that he did not have his clients sign reaffirmation agreements.  *See* Email from Carl D'Angio Jr. to Bruce Hochman, *et al*. (July 19, 2017) (the "7/19/17 Email"), attached hereto as Exhibit C.  Following that email, and upon request of Debtor's Bankruptcy Counsel, counsel for BSB presented their position and supporting case law that 11 U.S.C. § 521 requires an election and performance of one of the three enumerated options (reaffirm, redeem, or surrender) and that the "ride though" option was not permitted under Section 521.

Debtor's Bankruptcy Counsel agreed with BSB's position and Debtor elected to enter into a reaffirmation agreement.  The parties worked together to prepare the Reaffirmation Agreement but due to Debtor's Bankruptcy Counsel's schedule and Debtor having moved to Maine, counsel for BSB, with the written consent of Debtor's Bankruptcy Counsel, filed two extensions of the deadline to file a Reaffirmation Agreement.  *See* Dkt. Nos. 11 and 13.

After some back and forth, on September 11, 2017, Debtor's Bankruptcy Counsel sent an executed reaffirmation agreement to counsel for BSB and asked counsel for BSB to file it with the Court.  Counsel for BSB responded that Debtor did not complete the section necessary to rebut the presumption of undue hardship and asked Debtor's Bankruptcy Counsel to complete that section.  Debtor's Bankruptcy Counsel (via his legal assistant) responded that Debtor had moved to Maine (in September 2017), gotten a new job, that they were going to need to Amended Schedules I & J, and that they would need another 3-week extension.  *See* Email from Joanne Wyman to Debra Gerry, *et al*. (September 14, 2017) (the "9/14/17 Email"), attached hereto as Exhibit D.  In response, counsel for BSB agreed to move to extend the Reaffirmation Agreement one more time for 3 weeks, per Debtor's Bankruptcy Counsel's request.  *See* Dkt. No. 18.

3

In spite of that representation, later that same month, Debtor's Bankruptcy Counsel decided that no amended Schedules were necessary and otherwise did not make any further revisions to the Reaffirmation Agreement. Accordingly, on October 6, 2017, the Reaffirmation Agreement was filed as-is (*i.e.* without the requested changes showing that Debtor could afford the payments) (the "Reaffirmation Agreement"). *See* Dkt. No. 20; Compl. Ex. F.

Additionally, due to Debtor's Bankruptcy Counsel's refusal to reflect Debtor's change in circumstances on the Reaffirmation Agreement to rebut the presumption (*i.e.* reduced expenses and increased income), BSB filed a Motion to Compel Election under 11 U.S.C. § 521(a)(2)(A) [Dkt. No. 21] (the "Motion to Compel") based on Debtor's failures to comply with his obligations under that section in good faith. Specifically, BSB argued that Debtor had not sufficiently followed through with his election to reaffirm, as required by Section 521(a)(2)(B), and that, to the extent the Reaffirmation Agreement was denied, Debtor should be required to elect one of the remaining two options: redeem or surrender.

On October 31, 2017, the Bankruptcy Court held a hearing on the Reaffirmation Agreement, at which Debtor's Bankruptcy Counsel represented for the first time that Debtor could not afford to reaffirm and, accordingly, the Court denied the Reaffirmation Agreement. *See* Dkt. No. 28; Compl. Ex. G. The Court then deemed the Motion to Compel moot and found that attempting to enter into a Reaffirmation Agreement, even if denied, satisfied Debtor's obligation under Section 521. *See* Dkt. No, 27. On November 28, 2017, this Court issued an order discharging the Debtor [Dkt. No. 30] (the "Discharge Order"), which states, in part: "However, a creditor may have the right to enforce a valid lien, such as a mortgage or security interest, against the debtor's property after the bankruptcy, if that lien was not avoided or

eliminated in the bankruptcy case." *See* Compl. Ex. H. On December 4, 2017, this Court

entered an order discharging the trustee and closing the case. *See* Dkt. No. 32.

Pursuant to the terms of the Mortgage and as authorized by 11 U.S.C. § 506, BSB, as an

oversecured creditor, added its fees and costs incurred post-petition related to Debtor's Chapter 7

bankruptcy to its *in rem* claim. *See* the Mortgage, § 9.

Post-Discharge

Following the Discharge Order, as specifically authorized by 11 U.S.C. § 524(j), BSB

sent regular monthly statements to Debtor. Copies of all the statements sent from BSB to Debtor

between December 2017 and March 2020 are attached hereto as one Exhibit E (the "Monthly

Mortgage Statements"); *see also* Compl. Exs. J, K, and O (Monthly Mortgage Statements for

December 2017, January 2018, and May 2019). At no time between receiving his discharge and

filing his Motion to Reopen this case (December 2017-February 2020) did Debtor, Debtor's

Bankruptcy Counsel, or Debtor's current counsel ever request that BSB stop sending the

Monthly Mortgage Statements.

The Monthly Mortgage Statements sent between December 2017 and September 2018

mirrored BSB's regular monthly mortgage statements sent to Debtor prepetition. The Monthly

Mortgage Statements sent from October 2018-July 2019 contained the following bankruptcy

language:

> Please be advised that this communication is being sent in order to comply with
> the bank's obligations under Section 6111 of Title 14 of the Maine Revised
> statutes or other applicable law. If you are currently in bankruptcy, or if you have
> previously received a discharge in bankruptcy and did not otherwise reaffirm the
> underlying obligation owing to the bank during your bankruptcy case, this
> communication is not, and should not be construed to be, an attempt to collect the
> debt against you personally, but is notice of a possible action by the bank to
> enforce the lien against any collateral securing the debt.

5

The Monthly Mortgage Statements sent from August 2019 on all contain the following statement:

> Our records show that you are a debtor in bankruptcy or you discharged your personal liability for your mortgage loan in bankruptcy. We are sending this statement to you for information purposes only. It is not an attempt to collect a debt against you.  If you want to stop receiving statements, write to us.

Generally speaking, post-petition, Debtor has made all of his voluntary post-petition monthly mortgage payments and as of the date of this Motion, the loan is current.  At no point has Debtor made any voluntary post-discharge payments toward the fees and cost referenced in the Monthly Mortgage Statements.  At no point has BSB applied Debtor's voluntary post-petition monthly payments in satisfaction of the outstanding fees and costs.  And at no point did BSB attempt to collect against Debtor, personally, for the fees and costs or otherwise take any action against Debtor (or the Property) for the absence of payments for those fees and costs for the more than two years in question.  Simply put, BSB has made no attempts—ever—to collect such amounts from the Debtor, personally, or the Property, and the Complaint does not allege otherwise.

Other than the Monthly Mortgage Statements, the only post-discharge communications between Debtor (or his representative) and BSB (or its representative) have been as follows:

a.  In December 2017, Debtor called counsel for BSB directly regarding the fees listed on his December monthly mortgage statement.  After receiving permission in writing to speak to Debtor directly from his Bankruptcy Counsel, counsel for BSB had a brief conversation with Debtor regarding his concerns with those fees and why they were incurred.  When it appeared that Debtor was unfamiliar with some of the communications between Debtor's Bankruptcy Counsel and counsel for BSB, BSB's counsel directed Debtor to speak with his Bankruptcy Counsel.

6

b.  In January 2018, Counsel for BSB also exchanged one email with Debtor's
Bankruptcy Counsel explaining that fees had been incurred pursuant to the terms of
the Mortgage and they would need to be paid before the lien was released.

c.  On March 15, 2019, Debtor's current counsel (Attorney Simon) sent a demand letter
to BSB asserting a claim pursuant to 93A (the "<u>Demand Letter</u>").  *See* Demand
Letter, attached hereto as Exhibit F; *see also* Compl. Ex. M.

d.  On April 26, 2019 counsel for BSB responded to the Demand Letter.  *See* Letter from
Bruce Hochman to Jacob Simon (April 26, 2019), attached hereto as Exhibit G; *see
also* Compl. Ex. N.  BSB's position is that the asserted claim was baseless, both
substantively and procedurally, because the fees and costs were assessed pursuant to
the terms of the Mortgage, and it is very likely that 93A was never applicable because
Debtor was not a resident of Massachusetts for the time period in question.[1]  BSB
incurred fees responding to the Demand Letter and added those fees to the Mortgage
pursuant to its *in rem* rights and the terms of the Mortgage.

On March 8, 2020, Debtor filed his Motion to Reopen.  On March 21, 2020, BSB filed its
Objection to the Motion to Reopen. On April 8, 2020, after hearing, the Court granted Debtor's
Motion to Reopen.  The Complaint was filed on April 21, 2020.

## LEGAL STANDARD

"Under Federal Rule of Civil Procedure 12(b)(6), made applicable to adversary
proceedings in bankruptcy cases by Federal Rule of Bankruptcy Procedure 7012(b), a party may
move to dismiss a claim for 'failure to state a claim upon which relief can be granted.'"  *In re
Fin. Res. Mortg., Inc.*, 454 B.R. 6, 9 (Bankr. D.N.H. 2011) (quoting Fed. R. Civ. P. 12(b)(6)).

---

[1] Consistent with BSB's position, Debtor did not assert a 93A Claim in his Complaint.

{EP - 03447884 - v12 }

"In ruling on a Rule 12(b)(6) motion to dismiss, courts 'must accept as true the well-pleaded factual allegations of the complaint' and draw all reasonable inferences in the plaintiff's favor.'" *Id.* at 9-10 (quoting *LaChapelle v. Berkshire Life Ins. Co.,* 142 F.3d 507, 508 (1st Cir. 1998). "While a complaint does not require detailed factual allegations to survive a motion to dismiss, it must contain more than labels and legal conclusions." *Id.* at 10 (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955 (2007), *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1950 (2009)); *see also In re: Joseph A. Foistner, Debtor Antonia Shelzi, Plaintiff v. Joseph A. Foistner, Defendant*, No. AP 17-1083-BAH, 2018 WL 3532900, at *1–2 (Bankr. D.N.H. July 20, 2018) (discussing *Iqbal / Twombley* plausibility standard).

"Dismissal is appropriate if the facts as alleged do not 'possess enough heft to show that plaintiff is entitled to relief.'" *Lance v. PNC Bank, N.A.*, No. 15-10250-FDS, 2015 WL 5437090, at *2 (D. Mass. Sept. 15, 2015) (quoting *Ruiz Rivera v. Pfizer Pharm., LLC*, 521 F.3d 76, 84 (1st Cir. 2008)). "And, although trial courts must take all factual allegations in the complaint as true, they are not bound to accept as true legal conclusions couched as factual allegations." *In re Fin. Res. Mortg., Inc.*, 454 B.R. at 10 (citing *Twombly*, 127 S.Ct. at 1949–50).

## ARGUMENT

### A.  The Complaint Fails to Assert a Valid Claim for Violation of the Discharge Order

Section 524 of the United States Bankruptcy Code "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived . . . ." 11 U.S.C. § 524(a)(2). "The 'common factor' in cases where courts 'find a violation of either the automatic stay or the discharge injunction by a mortgagee for loan related correspondence' is 'a clear demand for payment of a pre[-]petition debt accompanied by coercion in the form of threatened action or some other consequence for nonpayment, or

harassment to induce the debtor to pay.'" *In re Kirby*, 599 B.R. 427, 441 (B.A.P. 1st Cir. 2019)

(quoting *Elliott v. PHH Mortg. Corp. for Key Bank Nat'l Ass'n*, No. 15-CV-01221(BKS), 2017

WL 10153593, at *5 (N.D.N.Y. Mar. 3, 2017)) (alteration original).

Here, the conduct complained of is that, after the Discharge Order entered, BSB sent

monthly mortgage statements that included incurred fees and cost due under the Mortgage

pursuant to BSB's *in rem* rights.  The conduct alleged in the Complaint, even when accepted as

true, is not sufficient to allege a legally cognizable claim for violation of the Discharge Order on

its face, especially when applying the mandate handed down by the Supreme Court in *Taggart*

and the safe harbor found in 11 U.S.C. § 524(j), and, therefore, Count I of the Complaint should

be dismissed.

    1.    *Taggart* Precludes a Finding of a Discharge Order Violation

In 2019, the Supreme Court handed down a clear directive in the *Taggart* case regarding

the standard to be applied in discharge violation cases: if there is an objectively reasonable basis

for concluding that the creditor's conduct might be lawful, then there cannot be a violation of the

discharge injunction.  *See Taggart v. Lorenzen*, 139 S. Ct. 1795, 1799 (2019).  In that decision,

the Supreme Court held that a creditor may violate the discharge injunction only "if there is *no*

*fair ground of doubt* as to whether the order barred the creditor's conduct." *Id.* (emphasis

original).  "In other words, civil contempt may be appropriate of there is no objectively

reasonable basis for concluding that the creditor's conduct might be lawful." *Id.*  Accordingly,

even if the Monthly Mortgage Statements (all or some) rise to the level of a violation of the

Discharge Order (which, they do not), BSB cannot be held in contempt if there was an

objectively reasonable basis for its conduct.

{EP - 03447884 - v12 }

Here, BSB asserts two objectively reasonable bases for sending the Monthly Mortgage Statements.  One, the Monthly Mortgage Statements do not violate the Discharge Order because they do not rise to the level of coercive, harassing, or threatening.  Two, Section 524(j) exempts sending the Monthly Mortgage Statements from the scope of the discharge injunction. Accordingly, it was objectively reasonable for BSB to believe that the Discharge Order did not apply to the Monthly Mortgage Statements.[2]

2.      The Monthly Mortgage Statements Do Not Violate the Discharge Order

As a threshold matter, the Monthly Mortgage Statements themselves do not rise to the level of a violation of the Discharge Order.  Debtor's Complaint fails to allege any conduct from which this Court could infer "coercion in the form of threatened action or some other consequence for nonpayment, or harassment to induce the debtor to pay."  *In re Kirby*, 599 B.R. at 441.  The Complaint does not allege that (1) Debtor asked BSB to stop sending the mortgage statements; (2) that BSB took Debtor's voluntary monthly mortgage payments and applied them to fees and costs; or (3) that BSB took any action or made any communication that threatened, coerced, or harassed Debtor.

What Debtor does allege in the Complaint is that he understood the December 2017 and January 2018 statements to mean that he needed to pay BSB's fees and costs by the following month because they were included in the "total amount due" on those statements.  *See* Complaint Nos. 17-20. Yet, Debtor then alleges that he reached out, through his Bankruptcy Counsel, to counsel for BSB and was told that the fees and costs would simply need to be paid "before the lien was discharged" completely contradicting his prior allegation.  *See* Compl. ¶ 22 & Ex. L.

---

[2] Further, at no time in the more than two years that elapsed between entry of the discharge and the filing of the Motion to Reopen did Debtor ever object to receiving Monthly Mortgage Statements or otherwise request BSB to stop sending them.  Accordingly, it was also objectively reasonable for BSB to believe that Debtor did not object to receiving the Monthly Mortgage Statements.

{EP - 03447884 - v12 }

Debtor further alleges that he continues to get monthly statements from BSB that now include "'limiting language' regarding personal debt liability after bankruptcy," Compl. ¶ 21, but that because the fees and costs are still listed, he "believes that BSB is coercing him into paying a large sum of money that he does not understand," Compl. ¶ 27.

Debtor's alleged subjective confusion as to why BSB has been required to incur fees is not a basis for a violation of the Discharge Order. *In re Best*, 540 B.R. 1, 9 (B.A.P. 1st Cir. 2015) ("Coercion [in the context of a discharge injunction violation] is assessed under an objective standard, and the issue of whether a creditor acted in an objectively coercive manner is determined on the specific facts of each case." (quoting *Bates v. CitiMortgage, Inc. (In re Bates)*, 517 B.R. 395, 398 (Bankr.D.N.H.2014)). Unfortunately, the conduct of Debtor and his Bankruptcy Counsel during his Chapter 7 case, as well as Debtor's decision to threaten baseless litigation against BSB, are the reasons BSB was required to incur fees and costs. That aside, a dispute over the amount of fees and cost incurred pursuant to the Mortgage is not a basis for a claim for a violation of the Discharge Order, rather it is a matter for state law (i.e. a dispute over a contract term).

Including incurred fees and costs in the Monthly Mortgage Statements, absent any other action, does not rise to the level of coercion, threatened action, or harassment necessary to sustain a claim for violation of section 524(a). *In re Best*, 540 B.R. at 11 ("Other than the fact that [the mortgagee] sent the post-discharge correspondence to the Debtor, there is nothing in the pleadings that demonstrated that [the mortgagee] was attempting to collect the discharged debt from the Debtor personally, or that it was demanding or coercing the Debtor to make payment on the account.").

{EP - 03447884 - v12 }

Given that Debtor was still living in the house and voluntarily making monthly mortgage payments, it was reasonable for BSB to send the Monthly Mortgage Statements that included all amounts incurred pursuant to the Mortgage for notice purposes. *See In re Ladebush*, No. AP 13-1154-JMD, 2016 WL 675580, at \*9 (Bankr. D.N.H. Feb. 18, 2016) (where debtors indicated an intent to stay in the property post-petition, "it was only logical for [the creditor] to send account statements that informed the Debtors of the voluntary payment necessary to bring the mortgage current."). Using the necessary "buzz words" in legal conclusions couched as factual allegations is not sufficient. In fact, the totality of the circumstances here show a lack of the necessary conduct needed for a finding for a violation of the Discharge Order. *See id.* at \*10 ("[T]he totality of the circumstances requires consideration of all the prior activity between the two parties to assess whether they were improperly coercive.").

Here, Debtor made voluntary principal and interest payments post-discharge. Those payments were applied to principal and interest, not the fees and costs listed. When Debtor chose not to make any payments towards fees and costs for over 2 years, BSB took no action, either against Debtor or the Property. Further, when asked, counsel for BSB simply said that those fees and costs need to be "paid before the lien is discharged." Compl. ¶ 22; Compl. Ex. L. No threat of foreclosure. No consequence for non-payment.

Additionally, BSB's bankruptcy disclaimer language included in the majority of the Monthly Mortgage Statements demonstrates BSB's legitimate intent simply to provide the Debtor with necessary information to allow him to determine the amount that would need to be paid to discharge the lien and allow Debtor to make those voluntary payments, should he decide to do so, consistent with the explicit language of the Discharge Order. *See* Compl. Ex. H (Discharge Order language alerting Debtor that "a creditor may have the right to enforce a valid

12

lien . . . against the debtor's property after bankruptcy . . . [and that] a debtor may voluntarily pay

any debt that has been discharged.").  Given the totality of the circumstances, sending the

Monthly Mortgage Statements does not rise to the level of a violation of the Discharge Order and

Count I should be dismissed.

3.  Section 524(j)'s Safe Harbor Dispenses with Debtor's Discharge Violation Claim

11 U.S.C. § 524(j) carves out specific acts from Section 524's general discharge

injunction, rendering it inapplicable to those specific acts.  *See Gonzalez v. Real Time*

*Resolutions, Inc*., No. 19-CV-297-JL, 2019 WL 7596280, at *3 (D.N.H. Oct. 29, 2019) (section

524(a)(2) does not enjoin acts enumerated in section 524(j)).  Specifically, Section 524(j) reads:

> Subsection (a)(2) does not operate as an injunction against an act by a creditor
> that is the holder of a secured claim, if— (1) such creditor retains a security
> interest in real property that is the principal residence of the debtor; (2) such act is
> in the ordinary course of business between the creditor and the debtor; and (3)
> such act is limited to seeking or obtaining periodic payments associated with a
> valid security interest in lieu of pursuit of in rem relief to enforce the lien.

There is no question that the conduct alleged (*i.e.* sending the Monthly Mortgage Statements) fits

squarely into the Section 524(j) exemption.

First, there is no dispute that BSB "retains a security interest in real property that is the

principal residence of the debtor."  § 524(j)(1).  Debtor's Schedule D lists BSB's Mortgage on

the Property and BSB's debt and secured status is not disputed.  *See* Compl. ¶ 8; *see also* the

Mortgage.  Further, as of September 14, 2017 (two months before the Discharge Order entered),

Debtor was living in the Property and, upon information and belief, has remained there since.

*See, e.g*., Compl. ¶ 1 (listing his residence as the Property); *see also* Exhibit D (Debtor was

living in the Property as of September 2017); s*ee also In re Lemieux*, 520 B.R. 361, 369 (Bankr.

D. Mass. 2014) (the relevant time for determining the debtor's principal residence is when the

{EP - 03447884 - v12 }

statements were sent, not on the petition date). Thus, the Property has been his residence for the entirety of the period in question.

Second, sending monthly mortgage statements fits squarely within "the ordinary course of business between the creditor and the debtor." § 524(j)(2). It is ordinary and customary for a mortgage company to send monthly statements, which the Monthly Mortgage Statements are. *See In re Rodriguez Muniz*, No. 08-01605 (MCF), 2018 WL 317256, at *3 (Bankr. D.P.R. Jan. 5, 2018) (automatically generated statement showing basic loan information satisfied the second prong of § 524(j)); *see also In re Ladebush*, 2016 WL 675580, at *7 (the "act of sending account statements was itself within the ordinary course of business.").

Third, the Monthly Mortgage Statements were sent for the sole purpose of "seeking or obtaining periodic payments associated with a valid security interest in lieu of pursuit of in rem relief to enforce the lien." § 524(j)(3). Absent Debtor making voluntary monthly payments, BSB would have moved forward with its state law *in rem* rights; *i.e.* a foreclosure. *See Johnson v. Home State Bank*, 501 U.S. 78, 86 (1991) (only a debtor's *in personam* liability is discharged, leaving the secured creditor's *in rem* rights in the mortgage, which "has the same properties as a nonrecourse loan."). The purpose of the Monthly Mortgage Statements was to allow Debtor to make voluntary periodic payments, which he did, and, in turn, BSB did not take any action to foreclose on the Property. *See In re Ladebush*, 2016 WL 675580, at *9 (where debtors intend to remain in the property, it is "only logical" for creditors to send statements to allow them to make voluntary payments to avoid foreclosure).

The fact that the fees and costs where included in the "total amount due" line in some of the Monthly Mortgage Statements does not mean that BSB was not "seeking or obtaining periodic payments." *See In re Ladebush*, 2016 WL 675580, at *8 (Interpreting section 524(j)(3)'s

reference to "periodic payments" as including past due amounts necessary to bring the account

current). Taken in the context of the above facts, it is clear that the Monthly Mortgage

Statements were simply an attempt to provide Debtor with the information necessary to allow

him to make voluntary periodic monthly payments in lieu of acting on BSB's state law *in rem*

rights as against the real property. Accordingly, the Monthly Mortgage Statements are exempt

under Section 524(j) and there can be no violation of the Discharge Order as a matter of law.

## B. **The Complaint Fails to State a Claim For Violation of the Automatic Stay**

11 U.S.C. § 362(a)(6)[3] stays "any act to collect, assess, or recover a claim against the

debtor that arose before the commencement of the case under this title." Here, Debtor asserts

that BSB violated the automatic stay by: (1) entering into a voluntary Reaffirmation Agreement

with Debtor when Debtor's Schedules indicated he may not be able to afford his payments, (2)

incurring fees and costs post-petition without seeking or receiving prior approval.[4] Neither act

violates 11 U.S.C. § 362(a)(6) and Count II should be dismissed.

1.  Negotiating and Entering into a Reaffirmation Agreement that is Ultimately
    Denied is not a Violation of the Automatic Stay

In general, courts have denied claims for violation of the automatic stay based on a

creditor's negotiation of a reaffirmation agreement. For example, the Rhode Island bankruptcy

court stated in *In re Jefferson*:

> If [§ 362(a)(6)] is construed as prohibiting any actions by the creditor aimed at
> obtaining the debtor's consent to repay a prepetition debt, then the creditor's
> ability to negotiate reaffirmation agreements is essentially destroyed. . . . [A]n
> interpretation of § 362(a)(6) which prevents creditors from negotiating
> reaffirmation agreements would significantly impair the bankruptcy process. A
> deeply rooted principle of American jurisprudence is to favor settlement and,

---

[3] Debtor does not direct the Court to this subsection, but it appears to be his assertion.
[4] The Monthly Mortgage Statements and the fees referenced in the Complaint are all from a period after the automatic stay was terminated (i.e. after the Discharge Order entered). As such, the automatic stay is not applicable and any claim for an alleged violation of the automatic stay based on the Monthly Mortgage Statements must fail as a matter of law.

{EP - 03447884 - v12 }

conversely, to discourage litigation. . . .  In short, a literal interpretation of §
362(a)(6) creates tension between that subsection and other provisions of the
Code, and suffers from terminal impracticality.

144 B.R. 620, 623 (Bankr. D.R.I. 1992) (citation omitted); *see also In re Holloway*, 337 B.R. 6,

11 (Bankr. D. Mass. 2006) (citing *In re Jefferson* and dismissing a claim for violation of the

automatic stay based on a creditor's negotiation of a reaffirmation agreement).

As the First Circuit stated in *In re Jamo*, "a creditor may discuss and negotiate terms for

reaffirmation with a debtor without violating the automatic stay as long as the creditor refrains

from coercion or harassment."  283 F.3d 392, 339 (1st Cir. 2002).  The Complaint here fails to

set forth any factual support that would make plausible its claim that BSB took any act that is or

could be construed as coercion or harassment, nor could the Debtor allege any.

Debtor alleges that: (1) BSB should have known as of the petition date[5] that the

Reaffirmation Agreement was not feasible and would be denied, Compl.¶ 7; (2) that BSB never

sought approval of attorney's fees in connection with the Reaffirmation Agreement, Compl. ¶

12; and (3) that BSB never sought approval of attorney's fees in connection with the bankruptcy,

Compl. ¶ 13.  Those allegations do not plausibly support Debtor's claim that BSB violated the

automatic stay with regard to the Reaffirmation Agreement.

Even if Debtor's Bankruptcy Counsel had not communicated that Debtor had a change to

his financial circumstances post-petition, the facts alleged do not result in a violation of the

automatic stay.  Certainly, reaffirmation agreements may be filed showing that a debtor cannot

make the proposed payments; that is why there is a box to check indicating as much (*i.e.*

presumption of undue hardship).  If that presumption was a bar to filing a reaffirmation

agreement, it would not be included as an option, but rather a threshold issue, which it is not.

---

[5] Debtor includes the date "March 17, 2017," he presumably meant May 17, 2017, the date he filed his petition and
schedules.

{EP - 03447884 - v12 }

Once that box is checked, debtors must explain why, in spite of the presumption being triggered,

the reaffirmation agreement should be allowed.  If they are able to adequately explain, a

reaffirmation agreement is allowed; if they are not, the reaffirmation agreement is denied. *See* 11

U.S.C. § 524(m)(1) ("[T]his presumption shall be reviewed by the court . . . [and] may be

rebutted in writing by the debtor if the statement includes an explanation that identifies

additional sources of funds to make the payments as agreed upon under the terms of such

agreement. If the presumption is not rebutted to the satisfaction of the court, the court may

disapprove such agreement."); *see also In re Newman*, No. 07-00689, 2008 WL 1944231, at *1

(Bankr. D.D.C. May 1, 2008).

It is not coercive to agree to such a reaffirmation agreement; the process is set up to

review those agreements and have the bankruptcy court judge determine if this is in the best

interest of the debtor.  The Court's ultimate decision to deny a Reaffirmation Agreement is not

tantamount to a violation of the automatic stay.  Similar to the facts in *Jamo*, here, this Court

ultimately denied the Reaffirmation Agreement because it found Debtor did not overcome the

presumption of undue hardship because Debtor's Bankruptcy Counsel argued, for the first time

at the hearing, that the agreement was not in Debtor's best interest.  *See In re Jamo*, 283 F.3d at

403. Of course, that appears to have been an inaccurate position; Debtor has stayed essentially

current with his post-discharge voluntary monthly mortgage payments, and was current or nearly

current leading up to, and during, the bankruptcy.

Similarly, by moving to require Debtor to comply with his obligations under Section 521,

BSB did not violate the automatic stay.  The First Circuit has clearly articulated that a Debtor

must elect one of three options under Section 521 (redeem, reaffirm, or surrender) and then

perform the elected option.  *See In re Burr*, 160 F.3d 843, 849 (1st Cir. 1998) ("[Section

17

521(a)(2)(A)] unambiguously requires chapter 7 debtors wishing to retain property of the estate

that secures a consumer debt to elect one of the retention options specified in [that section], and

then to perform the elected option in accordance with [section 521(a)(2)(B)].").    Here, while

Debtor executed the Reaffirmation Agreement, he did not, in good faith, complete the sections

required to overcome the presumption of undue hardship, sections that, based on representations

made by his Bankruptcy Counsel, would have been material to his ability to pay, and thus

approval of the Reaffirmation Agreement.  BSB, however, took no act to force Debtor to

accurately complete the Reaffirmation Agreement, simply requesting it of Debtor's Bankruptcy

Counsel.  When Debtor failed to do so, BSB filed the Reaffirmation Agreement as-is (*i.e.*

without those sections completed) as requested by Debtor, and sought relief from this Court by

way of its Motion to Compel because of what it perceived to be Debtor's lack of good faith to

comply with Section 521.  BSB openly put its concerns in front of the Court to be decided in the

appropriate venue; it did not harass or coerce Debtor.

That act—moving the Court to require Debtor to comply with his obligations under the

Bankruptcy Code—is explicitly authorized by the First Circuit:

> Of course, a debtor whose home is at stake is in an unenviable position. But a
> Chapter 7 discharge is not a walk in the park, it is a benefit that comes with
> certain costs.  Consequently, a Chapter 7 debtor is not inoculated against the
> necessity for making hard choices.  If the debtor surrenders his home, he is
> entitled to erase all his debts (secured and unsecured) and start afresh.  If,
> however, his paramount interest is in keeping his home and he cannot redeem the
> collateral, he must come to terms with the mortgagee.  Bankruptcy, as life itself, is
> a series of tradeoffs.

*In re Jamo*, 283 F.3d at 400 (internal quotation marks and citations omitted).  Given that,

Debtor has failed to allege any facts with regard to the Reaffirmation Agreement that

could plausibly lead this Court to find that BSB violated the automatic stay.

18

2.    <u>Incurring Fees Pursuant to the Mortgage and 11 U.S.C. § 506 is not a Violation of the Automatic Stay</u>

Incurring fees and costs pursuant to a valid Mortgage is not a violation of the automatic stay.  Debtor makes no allegations that BSB attempted to collect any fees and costs from Debtor while the case was pending, he only alleges that fees were incurred.  The mere fact of incurring fees without any other act is not sufficient for a finding of a violation of Section 362(a).  Debtor also alleges that BSB was somehow required to seek approval (presumably by the Court) to incur (and ultimately "collect") its fees.  *See* Compl. ¶¶ 12, 13, 48.  That argument is directly refuted by Section 506(b) of the Bankruptcy Code.

11 U.S.C. § 506(b) specifically allows an oversecured creditor to incur fees and costs post-petition, assuming a separate right to do so exists (such as a mortgage) under applicable law.  In Debtor's own Schedules he asserts that as of the Filing Date there was equity in the Property, rendering BSB an oversecured creditor.  *See* Schedule D.  Absent a legal determination of BSB's secured status otherwise, in the face of Debtor's own Schedules sworn to under the penalties of perjury, BSB had the right, pursuant to Section 506(b) and its Mortgage to add costs and fees to its Mortgage.  *See* Mortgage, § 9 (BSB may protect its interest in the Property and under the Mortgage, and Debtor "will pay to [BSB] any amounts, with interest, which [BSB] spends under this Section 9.").  BSB's incurring fees and costs permitted by the Bankruptcy Code and the Mortgage is not a violation of the automatic stay.[6]

## C.  <u>Damages Are Not Warranted – There was no Violation of the Automatic Stay or Discharge Injunction and Count III Should be dismissed</u>

The remedy for violations of the automatic stay is housed in 11 U.S.C. § 362(k), not Section 105, and allows for recovery of "actual damages, including costs and attorneys' fees,

---

[6] Even if BSB did not have the right, under Section 9 of the Mortgage or 11 U.S.C. § 506, to incur fees, doing so would not be a violation of the automatic stay, absent an attempt to collect those fees.

{EP - 03447884 - v12 }

and, in appropriate circumstances, may recover punitive damages." However, that subsection's application depends entirely on a prior finding that a violation of the automatic stay has occurred. As stated above, Debtor has not made out a case for violation of the automatic stay, so no § 362(k) damages may be awarded, and Court III should be dismissed. Similarly, Debtor has failed to plausibly allege a violation of the Discharge Order, so Count III should be dismissed for that reason as well.

## **CONCLUSION**

Debtor's Complaint fails to state a claim for a violation of the Discharge Order or for a violation the Automatic Stay and any resulting sanctions. For these reasons, Defendant Bangor Savings Bank requests that the Court dismiss the Complaint in whole and in part with prejudice.

Dated at Portland, Maine this 21st day of May, 2020.

/s/ Shawn K. Doil
Shawn K. Doil, Esq. (BBO# 670688)
Counsel for Bangor Savings Bank

Eaton Peabody, P.A.
100 Middle Street, PO Box 15235
Portland, ME  04112
(207) 274-5266
sdoil@eatonpeabody.com

20

{EP - 03447884 - v12 }

## CERTIFICATE OF SERVICE

I, Shawn K. Doil, Esq., certify that I caused to be served on this day true copies of Bangor Savings Bank's Motion to Dismiss, and this Certificate of Service, upon each of the parties set forth on the Service List below, via First Class U.S. mail, postage fully prepaid, on this date. All other parties listed on the Notice of Electronic Filing have been served electronically on this date.

Dated at Portland, Maine this 21st day of May, 2020.

/s/ Shawn K. Doil
Shawn K. Doil, Esq. (BBO# 670688)
Counsel for Bangor Savings Bank

Eaton Peabody, P.A.
100 Middle Street, PO Box 15235
Portland, ME  04112
(207) 274-5266
sdoil@eatonpeabody.com

## Service List

Michael H. Hahn (via email only)
Bangor Savings Bank

{EP - 03447884 - v12 }